BEVERLY SUE HATFIELD *et al.*, Plaintiffs-Appellants, *v.* SANDOZ-WANDER, INC., Defendant-Appellee.

First District (2nd Division)   No. 83—1140

Opinion filed May 29, 1984.

A. J. Hardiman, Ltd. and Eugene Hardiman, both of Chicago (A. J. Hardiman, of counsel), for appellants.

Rooks, Pitts, Fullagar & Poust, of Chicago (James G. McConnell, of counsel), for appellee.

JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiffs Beverly and Richard Hatfield, filed an action in strict liability against defendant, Sandoz-Wander, Inc., alleging that Beverly Hatfield ingested the prescription drug Mellaril over a period of time, as a result of which she lost most of her eyesight and is now legally

blind. Defendant manufactures, distributes and supplies the drug Mellaril. Defendant stipulated at trial that it was aware that a condition known as pigmentary retinopathy could occur from the use of Mellaril, and had warned of this possibility since 1961 in all prescribing information issued with the drug. Defendant also stipulated that in certain cases pigmentary retinopathy can result in blindness.

Plaintiffs' cause of action was based on the alleged inadequacy of the warnings which were supplied by defendant to the medical profession as to the possible side effects of Mellaril. After a jury trial, judgment was entered for defendant and plaintiffs now appeal. We affirm.

The warnings which were furnished by defendant appeared both in the Physician's Desk Reference (hereinafter referred to as P.D.R.), a reference book which is provided by the drug companies to physicians, containing all available information on prescription drugs, and on package inserts which are affixed to each container of Mellaril manufactured by defendant. Each P.D.R. contains a section labeled "Precautions" and one labeled "Warnings" as to each drug. During the years relevant to this lawsuit, the following information appeared under the "Precautions" section of the P.D.R.:

> "*** Pigmentary retinopathy, which has been observed in patients taking larger than recommended doses over long periods of time, is characterized by diminution of visual acuity, brownish coloring of vision, and impairment of night vision; examination of the fundus discloses deposits of pigment. The possibility of this complication may be avoided by remaining within the recommended limits of dosage."

The prescribing information also states that a maximum recommended daily dose for neurotic patients is 200 milligrams per day, and that the maximum daily dose for adult psychotics is 200 to 800 milligrams per day. The material states that "in all cases, the smallest effective dosage should be determined for each patient." Finally, all pharmacy bottles of the 200 milligram tablet size contain the warning that "This strength tablet is for use only in severe neuropsychiatric conditions," and the prescribing information specifically states that: "For severely disturbed *hospitalized* psychotics, dosages of 100 to 200 milligrams three times a day may be necessary." (Emphasis added.)

At the time of trial, Beverly Sue Hatfield was 47 years old. In the early part of 1960, she had been hospitalized for emotional problems, during which time she underwent 25 electro-shock treatments. Plaintiff's problems were precipitated by the birth of a new baby and the knowledge that her husband Richard, who had been injured as a serviceman in Korea, was to become a cripple and would possibly end

up in a wheel chair. Mellaril was first prescribed for plaintiff by her physician, Dr. Hammel, in August of 1969, at which time she took one 50 milligram tablet per day. Plaintiff continued using Mellaril in varying amounts through January of 1974: from August 1971 to December 1971, she took two 200 milligram tablets per day and from January 1972 to August of that year she took three per day; from September 1972 to May 1973 she took three to four tablets per day; and from July 1973 to January 1974, she took from five to as many as eight 200 milligram tablets per day. Plaintiff never took in excess of eight tablets per day. Dr. Hammel retired in February 1972, and Dr. Pillai became the prescribing doctor for the remaining period. Plaintiff obtained all of the prescriptions at either one of two drugstores. She was not sure whether the prescription label said two, or three to four tablets in the latter part of 1973, but she testified that her doctor allowed her three to four, and that when she began to tolerate the effects of Mellaril, Dr. Hammel would double it. She was never able to obtain Mellaril without a prescription. The record shows that the largest prescription plaintiff actually received before she became blind was for two tablets per day of 200 milligrams each. Thus, by plaintiff's own admission, from July 1973 to January 1974, she took up to 1,600 milligrams per day; four times more than her largest prescription allowed. The pharmacy records show that during June and July, she purchased as much as 3,157 milligrams per day, almost eight times the amount allowed under her largest prescription. Plaintiff testified that Dr. Pillai didn't state anything to her with regard to her taking the drug, and that although he never specifically stated that she could take six to eight pills per day, she did not think that she was going against what the doctor allowed when she did so. In January 1974, plaintiff woke up one morning and found that most of her eyesight was gone. She is presently unable to do housework or to take care of her personal needs.

Plaintiff's husband, Richard, was 50 years old at the time of the trial. He testified that he had had disagreements with his wife over her use of Mellaril, and that she often became sleepy and groggy from the pills. He threw the pills away three to four times in the middle of 1973.

Dr. Gerald Fishman, an opthamologist, testified as plaintiffs' first expert witness. Based upon his examination of Beverly Hatfield, he determined that she was legally blind, that her condition was permanent, and was consistent with the use of Mellaril. Dr. Fishman stated his opinion that defendant's warnings concerning Mellaril failed to cover the spectrum of the potential seriousness of the complication

that could occur with the use of the drug. He also stated his belief that in order to make the warnings adequate regarding irreversible eye complications from Mellaril, they should include some statement about the potential severity of the complications; that they may be irreparable and that they may progress even if the patient goes off the drug. In Dr. Fishman's opinion, it was foreseeable to the defendant prior to 1974 that some patients were taking in excess of 1,600 milligrams of Mellaril a day, as evidenced by a statement in the 1968 P.D.R. that the specified retinal problems may well occur if the dosage exceeds 1,600 milligrams.

Dr. William Barnhart, an internist, testified that, with reference to the material contained in the P.D.R.'s concerning Mellaril, his opinion was that the difference between "precautions" and "warnings" was that warnings implied a much more severe risk to patients than precautions. He did not believe that the relevant information as set forth in the P.D.R. was adequate to warn physicians of the possible complications of going over any particular dose of Mellaril; nor did he think that Dr. Pillai had been adequately warned that the drug could cause irreversible eye damage to plaintiff, based on the fact that plaintiff was able to obtain and take through the doctor's prescription from 1,000 to 1,600 milligrams of Mellaril per day over a seven month period.

The deposition of Dr. John Reuter, another of plaintiffs' experts in opthamology, was introduced. Dr. Reuter treated Beverly Hatfield in January 1974 and again in May of that year. His diagnosis of plaintiff's condition was Mellaril intoxication with pigmentary retinopathy. Dr. Reuter's only criticism of the materials issued by defendant was the failure to state the possibility that the eye complications resulting from the use of Mellaril could be irreversible. Both Dr. Reuter and Dr. Barnhart admitted, however, that if the prescribing doctor knew that pigmentary retinopathy could result in a complete loss of vision, then he or she would have been adequately warned.

Dr. Pillai testified, stating that he consulted the P.D.R. when he first authorized the pharmacy to refill Dr. Hammel's prescription of Mellaril for Beverly Hatfield. When he viewed the statement that pigmentary retinopathy had occurred in patients taking larger than recommended doses of Mellaril over a long period of time, he was aware of the fact that pigmentary retinopathy could result in a complete loss of vision in some patients. He presumed that he reviewed the P.D.R. in November 1973. Dr. Pillai had no formal training concerning eye problems other than what he had received in basic medical school, and his only knowledge of the drug Mellaril was that which

he had derived from the P.D.R. Dr. Pillai's deposition was also introduced, in which he stated that on July 7, 1972, plaintiff had asked him to authorize the pharmacist to continue dispensing Mellaril, which had been earlier prescribed for her by Dr. Hammel. His notes indicated that he ordered 50 milligram tablets to be taken three times a day, which was a lesser dosage than that which Dr. Hammel had prescribed. He again ordered the same prescription pursuant to a subsequent request by plaintiff on November 15, 1973. His notes also indicated that he advised plaintiff at that time to taper off gradually, with the eventual goal of stopping the medication.

Defendant presented the testimony of three expert witnesses, Drs. Lubin, Drill and Westlin, each of whom stated his opinion that the warnings about Mellaril in the material supplied by defendant were adequate, and that the absence of the words "permanent," "irreversible," "blindness" and "complete loss of vision" did not make Mellaril unreasonably dangerous. In addition, the evidence depositions of two pharmacists were introduced regarding plaintiff's prescription records. One of them also testified that at no time was plaintiff's prescription refilled before 10 days had elapsed without the express permission of Dr. Pillai.

The case went to the jury, who returned a verdict in favor of defendant, and this appeal ensued.

Plaintiffs complain of several alleged errors in the admission and exclusion of evidence concerning compliance with government standards, experts' opinion testimony and their conversations with Beverly Hatfield's physician who was deceased at the time of trial.

Prior to trial, plaintiffs filed a motion *in limine* to bar any testimony concerning the Food and Drug Administration's (F.D.A.) approval of Mellaril. The trial court ruled that the F.D.A. approval was admissible, but that the approval process was not. The trial court also denied plaintiffs' motion to bar even the mention of F.D.A. approval, and to strike any testimony regarding the F.D.A. given in plaintiffs' case and opening statement. Two of defendant's experts, Drs. Drill and Westlin, mentioned F.D.A. approval during their testimony, Dr. Westlin testifying that the F.D.A. determined that pigmentary retinopathy should be in the precautions section rather than the warnings section of the P.D.R. Over plaintiffs' objection, defense counsel emphasized during closing argument the F.D.A.'s awareness of Beverly Hatfield's injuries and its failure to require additional warnings. The trial court allowed this testimony and the related exhibits pursuant to *Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 396 N.E.2d 534, and *Moehle v. Chrysler Motors Corp.* (1982), 93 Ill. 2d

299, 443 N.E.2d 575. These cases make clear that evidence of compliance with Federal government standards is relevant in a strict tort liability case both on the issue of whether a product is defective and whether the defective condition is unreasonably dangerous.

■ Plaintiffs contend that approval of a drug by the F.D.A., which is based solely on material submitted by the manufacturer and not on independent testing by the agency itself, is not in compliance with any "measurable federal standard" to bring it within the purview of *Rucker* and *Moehle*. The cases, however, contain no such limitations. Further, the court in *Moehle* specifically rejected arguments by plaintiffs there that the jury may tend to overemphasize a manufacturer's compliance with governmental safety standards and, in cases of antiquated or grossly minimal safety standards, be misled as to the availability of safety technology. The court stated its belief that with careful instructions to the jury by the trial judge and effective argument by plaintiffs' counsel, the jury could properly evaluate the importance of safety-standard evidence and weigh it with all of the other evidence in the record. The court went on to state that the adversary process itself would also tend to diminish the misleading character of minimal or antiquated standards. (93 Ill. 2d 299, 305.) As was contemplated by the court in *Moehle*, plaintiffs here were able to, and did attack the value of F.D.A. approval during their closing argument, making the jury aware that no independent tests were done by the agency itself. Thus, the criteria set forth in those cases cited by plaintiffs appear to have been met.

■ Plaintiffs next assert that the trial court erred in allowing defendant's experts to rely on the deposition testimony of other doctors, pharmacists, and of Beverly Hatfield in forming their opinions. The Illinois Supreme Court, in *Wilson v. Clark* (1981), 84 Ill. 2d 186, 193, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140, recognized that expert opinion testimony may be based on facts not in evidence, as long as those facts are " '***of a type reasonably relied upon by experts in the particular field ***.' " The court in that case expressly adopted Federal Rules of Evidence 703 and 705 which permit an expert to give his or her opinion on the basis of reliable facts not in evidence, and without initially disclosing those facts. As explained in the Advisory Committee Notes to Rule 703, facts or data upon which expert opinions are based may, under the rule, be derived from three sources: (a) the first-hand observation of the witness, with opinions based thereon, (b) presentation at the trial, and or (c) presentation of data to the expert outside of court and other than by his own perception. The comment further recognizes

that:

"*** [A] physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays." (Fed. R. Evid. 703, Advisory Committee Notes.)

While the information relied upon here was contained in sworn deposition testimony, its content was identical to that which is contained in the Committee Note and plaintiffs have failed to show why the subject information, as such, would be any less reliable than the inadmissible, unsworn statements of patients, pharmacists and other doctors, which are clearly contemplated by the rule.

Plaintiffs' next claim, that their witness, Dr. Barnhart, should have been allowed to testify concerning his conversations with other physicians as to the adequacy of defendant's warnings contained in the P.D.R.'s, is also without merit. When read within the context of the record, it is clear that plaintiffs' offer of proof lacked any suggestion that any of the residents with whom Dr. Barnhart had spoken on the subject had actually read the relevant materials in the P.D.R. In the absence of such testimony, these conversations clearly cannot be considered to be of " '*** a type reasonably relied upon by experts in the particular field ***.' " *Wilson v. Clark* (1981), 84 Ill. 2d 186, 193.

■■ ■ Plaintiffs also appeal the trial court's exclusion of various statements made by the deceased Dr. Hammel to them regarding the lack of harmful effects from Mellaril. The trial court correctly refused to allow plaintiffs' offer of proof, as such statements would have constituted inadmissible hearsay. Plaintiffs argue that the alleged statements should be allowed as they are probative of the issue of whether Dr. Hammel was adequately warned about the ill effects of Mellaril. As this court has recognized, the prescribing doctor functions as "a learned intermediary" between the patient and the prescription drug manufacturer. (*Mahr v. G.D. Searle & Co.* (1979), 72 Ill. App. 3d 540, 561, 390 N.E.2d 1214.) It is the doctor's decision as to which facts should be told to the patient, and the extent of disclosure is a matter of medical judgment. (*Buckner v. Allergan Pharmaceuticals, Inc.* (Fla. App. 1981), 400 So. 2d 820, 823, citing *ZeBarth v. Swedish Hospital Medical Center* (1972), 81 Wash. 2d 12, 499 P.2d 1.) Given the instant facts, including the severity of Beverly Hatfield's emotional state at the time of the alleged statements, and in the absence of opportunity to test these self-serving statements by cross-examination, this court cannot speculate as to whether Dr. Hammel was indeed ex-

ercising his judgment in withholding certain information regarding the drug from plaintiffs. The trial court's ruling in excluding the statements was therefore proper.

Similarly, we find no merit in plaintiffs' next several claims of prejudice, including their claim that the trial court improperly excluded evidence that one of their expert witnesses was originally hired by defendant, that statistical evidence concerning the infrequency of pigmentary retinopathy from the use of Mellaril was improperly received into evidence; and that one of defendant's experts was improperly allowed to testify as to his own eye condition. A review of the record shows that the evidence which plaintiffs sought to introduce was irrelevant in the absence of any statements which would have rendered plaintiffs' expert an adverse witness, and that the testimony complained of was clearly invited by statements made by one of plaintiffs' experts or invited by statements made during plaintiffs' cross-examination of defendant's witness, and was therefore properly admitted. See, *e.g., People v. Williams* (1977), 66 Ill. 2d 478, 363 N.E.2d 801; and E. Cleary & M. Graham, Handbook of Illinois Evidence sec. 103.4 (1984).

■ At the close of the evidence, plaintiffs moved to file an amendment to the complaint containing a count for prejudgment interest, which motion was denied. As defendant now argues, plaintiffs' claim has been rendered moot by the verdict rendered in defendant's favor which we now affirm.

■ Plaintiffs also sought at trial to amend their complaint by adding two particular allegations of defect in the prescribing information for Mellaril; specifically, plaintiffs sought to allege a duty to warn patients about possible eye complications from use of the drug, and to allege that defendant should have directed physicians to conduct periodic eye examinations of their patients taking Mellaril. Plaintiffs now seek to have this court impose a requirement on drug manufacturers to include "patient package inserts" with all "dangerous drugs" that are dispensed. Such a ruling would not only negate the role of prescribing physicians as "learned intermediaries" between manufacturers and patients (*Mahr v. G.D. Searle & Co.* (1979), 72 Ill. App. 3d 540; *Buckner v. Allergan Pharmaceuticals, Inc.* (Fla. App. 1981), 400 So. 2d 820), but would also circumvent the exclusive power of the Federal government to determine the contents of prescriptive information. (21 U.S.C. sec. 301 *et seq.* (1982).) Finally, as conceded by plaintiffs, the instant lawsuit is clearly governed by the substantive laws of Indiana, the place of the occurrence. Pursuant to the law of that State, defendant's duty is limited to providing adequate warnings to prescribing

physicians, and does not run to patients or the ultimate users of prescription drugs. *Ortho Pharmaceutical Corp. v. Chapman* (1979), 180 Ind. App. 33, 388 N.E.2d 541.

Plaintiffs next assert error in the jury instructions given and refused on the issues of proximate cause, the nature and scope of defendant's duty to warn, and the definition of unreasonable danger. The record shows that the jury was fairly and adequately apprised of the elements of plaintiffs' case.

■ Specifically, plaintiffs complain of the court's refusal to give several negative instructions concerning defendant's contentions that poor pharmacy records were the sole cause of plaintiff's injuries. The trial court issued the long form of IPI Civil No. 15.01, which states:

> "When I use the expression 'proximate cause', I mean any cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury."

In addition, plaintiffs' counsel was given substantial opportunity to impress upon the jury that the existence of contributing causes other than defendant's inadequate warnings would not relieve defendant of liability. Under these circumstances, the jury was adequately instructed on the issue of proximate cause.

■ Similarly, the record fails to support plaintiffs' remaining contentions regarding defendant's duty to warn doctors, and the nature of the defect giving rise to liability. Where, as here, plaintiffs cannot show that they have been prejudiced by the giving or failure to give specific instructions, the case should not be reversed on such grounds alone. *Trippel v. Lott* (1974), 19 Ill. App. 3d 936, 312 N.E.2d 369, *appeal denied* (1974), 56 Ill. 2d 591.

■ Finally, plaintiffs argue that the jury's verdict was against the manifest weight of the evidence. We believe that the facts and testimony which were before the jury show at least a proper basis for its verdict, and accordingly, we affirm the judgment of the trial court. *Lawson v. G.D. Searle & Co.* (1976), 64 Ill. 2d 543, 356 N.E.2d 779.

Affirmed.

HARTMAN, P.J., and DOWNING, J., concur.