MEYER PROCTOR *et al.*, Plaintiffs-Appellants and Separate Appellees and Cross-Appellants, v. MICHAEL J. DAVIS, Defendant-Appellee (Upjohn Company, Separate Defendant-Appellant and Cross-Appellee).

First District (2nd Division)   Nos. 1—92—3151, 1—92—3513 cons.

Opinion filed September 26, 1995.

594

Mayer, Brown & Platt, of Chicago (Alan N. Salpeter and Laurie A. Gallancy, of counsel), Mayer, Brown & Platt, of Washington, D.C. (Andrew L.

Frey, Clifford M. Sloan, and Alan E. Untereiner, of counsel), and Todd W. Kingma, of The Upjohn Company, of Kalamazoo, Michigan, for appellants.

Goldberg & Goldberg (Barry D. Goldberg and Ann Herbert, of counsel), and David A. Novoselsky & Associates (David A. Novoselsky and Linda A. Bryceland, of counsel), both of Chicago, for appellee.

Bruce J. Brennan and Loretta E. Chi, both of Pharmaceutical Manufacturers Association, and Bruce N. Kuhlik and Lars Noah, both of Covington & Burling, both of Washington, D.C., for *amicus curiae*.

JUSTICE DiVITO delivered the opinion of the court:

Plaintiffs Meyer Proctor and Marjorie Proctor (collectively, plaintiffs) filed this action against The Upjohn Company (Upjohn) and Dr. Michael J. Davis (Davis), alleging injury resulting from Davis' mistaken injection of the corticosteroid Depo-Medrol, an Upjohn product, directly into Meyer Proctor's left eye on November 7, 1983. After three unsuccessful surgical attempts to reattach the retina, the eye, which had become blind and painful, was removed. After a five-week trial, a jury found in favor of Davis but against Upjohn, awarding plaintiffs compensatory damages of $3,047,819.76, and imposing punitive damages of $124,573,750. Later, the circuit court remitted the punitive damages to $35 million but otherwise left the verdicts intact.

Upjohn now appeals from the judgment; plaintiffs appeal the judgment for Davis; and plaintiffs cross-appeal the denial of their motion for sanctions and attorney fees. In an opinion issued on June 28, 1995, we affirmed the judgment for Davis and the denial of the motion for sanctions, and affirmed the judgment against Upjohn but remanded the case to the circuit court and instructed it to enter a remittitur of the punitive damages to an amount equal to the compensatory damages, $3,047,819.76. Plaintiffs filed a petition for rehearing on August 2, 1994, which we denied. Upjohn filed a petition for rehearing on the same date, which we granted. Following plaintiffs' response to Upjohn's petition and Upjohn's reply, as well as a brief in support of Upjohn's petition from *amicus curiae*, and additional oral argument, we again affirm the judgment for Davis and the denial of the motion for sanctions, but we now reverse the judgment against Upjohn and enter judgment notwithstanding the verdict in favor of Upjohn.

In 1959, the Food and Drug Administration (FDA) approved Upjohn's new drug application (NDA) for Depo-Medrol, a sterile, aqueous suspension containing methyl prednisone acetate, a corticosteroid, for the treatment of various inflammatory disorders throughout

the human body. Upjohn established the safety of the drug for its intended uses through acute toxicity animal studies. The FDA-approved methods of administration of the drug were limited to intramuscular (in the muscle), intra-articular (in the joint), and intralesional (in a lesion) injection.

Shortly after Depo-Medrol's FDA approval, two ophthalmologists contacted Upjohn independently, each wishing to use the drug clinically for the treatment of ophthalmic conditions through a nonapproved method of administration—periocular (near the eye) injections. The technique of periocular injections was widely used in the medical community; by 1983 physicians were using it an estimated 1 million times each year. Physicians had previously used periocular injections with other steroids to avoid the side effects from other methods of administration and to provide more direct action on the point of inflammation in the eye. As a new, longer-acting steroid, Depo-Medrol appeared to offer advantages for this type of use.

Upjohn provided these physicians, and others through the years, with financial and technical assistance and supplies of the drug. Between 1961 and 1964, several articles were published in the medical literature regarding periocular use of Depo-Medrol, including one instance in which a medical writer at Upjohn helped the treating physicians prepare the article.

In 1965, Dr. Samuel Stubbs, the Upjohn employee responsible for monitoring Depo-Medrol, collected articles in the medical literature and data supplied by these physicians, and prepared a report for internal use by the company. Based on that report, Stubbs and his immediate supervisor recommended that Upjohn consider filing a supplemental NDA to obtain FDA approval for periocular administration of the drug. Without FDA approval, Upjohn could not include that use of Depo-Medrol as an approved method of administration on the drug's labeling. The materials included in Stubbs' report indicated that Depo-Medrol appeared to be effective for various inflammatory conditions of the eye and that the side effects associated with periocular use were minimal. At the time Stubbs prepared his report, Upjohn had not received notice of any incident involving adverse effects from inadvertent intraocular (in the eye itself) injection of the drug.

Upjohn elected not to pursue a supplemental NDA for periocular administration. A corporate memorandum recommended that "no further Medical Development work be done with Depo-Medrol administered by [periocular] injection," and that "tissue tolerance studies in animals not be undertaken by Biomedical Research unless a request for N.D.A. supplement is initiated by Marketing, and ap-

proved in accordance with the currently effective Pharmaceutical New Product System procedures." Once Upjohn made that decision, it neither conducted, sponsored, nor supported any further clinical investigations of Depo-Medrol for periocular injection.

Thus, between the date it first appeared on the market in 1959 and the date of the relevant injection in this case in 1983, Upjohn's Depo-Medrol labeling never made any reference to periocular injection of the drug, neither listing it as an appropriate method of administration, including any recommended dosages, nor stating any warnings regarding periocular use. Nonetheless, physicians remained free to use the drug in any manner that they wished, including those uses not indicated in the labeling (off-label uses). Ophthalmologists, in particular, made extensive use of periocular injections of Depo-Medrol because the benefits were seen to outweigh the risks. Defendant Davis himself had made more than 3,000 periocular injections (including 1,600 periocular injections of Depo-Medrol) during his career. Four other ophthalmologists who were asked about the subject at trial testified to routine periocular administration of the drug, and medical textbooks recommended this off-label use.

When a pharmaceutical company receives a report about an adverse reaction associated with the use of its product, it records it in a drug experience report and forwards it to the FDA. In the 24 years between the first marketing of Depo-Medrol and the injection of Meyer Proctor that led to this suit, Upjohn received 23 reports indicating adverse experiences associated with its use. The drug experience reports based on these communications were forwarded to the FDA, usually accompanied by a cover letter stating that the use involved was not a recommended one. Three of these reports (one in 1977 and two in 1983) concerned vision loss following periocular injections with unintentional intraocular injection. Additionally, the medical literature had reported other instances of accidental intraocular injections of corticosteroids like Depo-Medrol, some of which were followed by vision loss.

In October 1980, in response to the FDA's comprehensive restructuring of labeling for all corticosteroids, Upjohn proposed a revised Depo-Medrol package insert. The proposed insert included the following statement:

> "ADVERSE REACTIONS REPORTED WITH NONRECOMMENDED ROUTES OF ADMINISTRATION ***
> Ophthalmic: (Subconjunctival)—Redness and itching, obtuse, slough at injection site, increased intraocular pressure, decreased vision. (Retrobulbar)—Blindness."

Subconjunctive and retrobulbar injections are types of periocular

injections. In September 1983, the FDA informed Upjohn that it should not make its proposed changes, but rather should "continue using currently approved labeling" until it received "notification" from the agency. However, the FDA also told Upjohn that "[i]f important new labeling information becomes available, you should revise your approved product labeling under 21 C.F.R. 314.8." The circuit court excluded this evidence.

In April 1983, Meyer Proctor, a retired public relations worker, consulted Davis, a board-certified ophthalmologist, with complaints of blurred vision. Davis diagnosed Proctor's condition as uveitis, an inflammation of the eye, which can be chronic and unremitting and can lead to permanent blindness. Davis began treating this condition with steroid medications applied to both of Proctor's eyes by means of eye drops. Topical administration of steroids, however, proved to be of only limited value in treating the uveitis.

In May 1983, Proctor developed cystoid macular edema (CME) as a complication of the uveitis, and the vision in his left eye deteriorated to the level of legal blindness. Davis referred him to a retinal-vitreal specialist for further evaluation and treatment. The specialist concurred in Davis' diagnosis of CME and prescribed Nalfon, a nonsteroidal anti-inflammatory medication. The Nalfon produced some improvement in Proctor's vision, but did not restore his sight to normal. After treating Proctor for several months, the specialist referred him back to Davis, recommending the use of a nonsteroidal anti-inflammatory drug (such as Nalfon), or the systemic or periocular administration of a steroid (such as Depo-Medrol) if continued impairment of vision made further treatment necessary.

On August 1, 1983, Davis examined Proctor and reinstituted treatment with Nalfon, which Proctor had temporarily discontinued. When Proctor's vision again began to deteriorate, on August 9, 1983, after concluding that no other treatment option would be effective, Davis decided to use periocular injections of Depo-Medrol to treat Proctor's condition. Davis gave Proctor one shot around each eye. Within several weeks, Proctor's vision improved almost to normal for the first time in months. In November 1983, however, Proctor experienced renewed problems with the vision in his left eye. In response, on November 7, 1983, Davis administered another periocular injection of Depo-Medrol near that eye.

All the ophthalmologists who testified at trial regarding the standard of care testified that Davis' decision to administer Depo-Medrol via periocular injection both in August and again in November of 1983 was appropriate and well within the applicable standard of care. None of them suggested that anything known at the time, or

subsequently discovered, would have made this treatment inappropriate. There were risks associated with this treatment, however. Davis himself testified that in November 1983 he knew that an inadvertent intraocular injection was a risk of any periocular injection. He also testified that, in his view, Depo-Medrol could be "toxic" if inadvertently injected into the eye, and could in that event cause damage to the eye, including blindness. Davis had never penetrated the globe of the eye (made an intraocular injection) in more than 1,600 prior periocular injections of Depo-Medrol, or during more than 1,800 periocular injections of other drugs, and he had no reason to doubt that he would also be able to deliver the drug to its intended location without incident in this instance.

During the November 7, 1983, injection, however, Davis mistakenly inserted the needle into Proctor's left eye, injecting some Depo-Medrol into the eye. Realizing that a significant complication was possible, Davis referred Proctor to a specialist for evaluation and treatment. The specialist determined that the appropriate treatment was observation, waiting for the drug to clear from the eye, and watching for possible retinal detachment. The Depo-Medrol did begin to clear, but the retina became detached, whereupon Proctor was referred to the University of Illinois Eye and Ear Clinic for surgery. On November 23, 1983, the Depo-Medrol was removed from Proctor's left eye, and the retina was reattached. The retina became detached again, however, and two subsequent operations, on December 13 and 29, 1983, failed to reattach it. In April 1984, Proctor's left eye, having become blind and painful, was surgically removed.

Plaintiffs filed suit on February 14, 1984, against Davis and Upjohn. Discovery having proceeded over a period of seven years, and motions *in limine* having been heard and ruled upon, trial began on September 4, 1991.

Plaintiffs' allegations against Davis were based on medical malpractice. They alleged that he violated the standard of care in one or more ways, directly and proximately causing Meyer Proctor's injury. They also alleged negligence based on *res ipsa loquitur* and loss of consortium. Plaintiffs' allegations against Upjohn were based on strict product liability. They alleged that Depo-Medrol was a defective, unsafe, and unreasonably dangerous product and that Upjohn's failure to warn Davis about the potential harm resulting from an intraocular injection directly and proximately caused Meyer Proctor's injury. They further alleged loss of consortium and willful, wanton, or reckless acts or omissions that would support punitive damages.

The only witnesses at trial were Davis, six experts, Stubbs, and plaintiffs.

On October 18, 1991, after hearing evidence for five weeks and deliberating for four hours, the jury returned verdicts in favor of Davis and against Upjohn. The jury awarded Meyer Proctor $3,047,819.76 in compensatory damages and $124,573,750 in punitive damages, and Marjorie Proctor $100,000 in compensatory damages. On September 3, 1992, the circuit court entered an order remitting the punitive damages to $35 million, but otherwise leaving the verdict intact. An order setting Upjohn's appeal bond at $51,780,000 was entered on September 30, 1992; this order also denied plaintiffs' motion for sanctions against Upjohn. Plaintiffs filed their notice of appeal regarding the judgment for Davis on September 10, 1992, Upjohn filed its notice of appeal on October 2, 1992, and plaintiffs filed their notice of cross-appeal against Upjohn on October 6, 1992.

# I

Plaintiffs appeal separately the jury verdict in favor of Davis. They contend that they are entitled to judgment notwithstanding the verdict or, in the alternative, a new trial. In support of their contentions, plaintiffs assert that expert testimony established that Davis was negligent in his administration of the periocular injection to Meyer Proctor because he failed to utilize required safeguards. They also argue that the circuit court erred in refusing to allow them to impeach Davis and in refusing to give their tendered jury instructions. Davis responds that the jury's determination that he complied with the standard of care is supported by substantial evidence; that plaintiffs never attempted to impeach him; and that plaintiffs' jury instructions were properly refused because they were not supported by the evidence.

■ As Davis points out, the jury's verdict in his favor had nothing to do with plaintiffs' product liability claim against Upjohn. Plaintiffs' medical malpractice claim against Davis came down to a single issue: whether Davis' failure to rock the needle from side to side after it was inserted in order to see if the eye moved constituted a breach of the standard of care. Plaintiffs' expert, Dr. William S. Fagman, testified that in his opinion Davis violated the standard of care. Davis' expert, Dr. Conrad L. Giles, testified that in his opinion Davis did not violate the standard of care. A factual issue was thus established for the jury to resolve, and the jury resolved it by finding Davis not liable. Absent a showing that the judgment entered on the verdict was against the manifest weight of the evidence, we will not disturb the judgment.

During the trial, Davis testified that he rotated the needle to the beveled edge during the injection. In his discovery deposition, he

never stated that he had done so. Plaintiffs assert that they should have been allowed to impeach Davis about the inconsistency in his testimony. However, Davis was never asked a specific question about the position of the bevel during his deposition. Further, at the time of the deposition, the position of the bevel was not an issue raised by the pleadings. Finally, plaintiffs were allowed, without objection, to cross-examine Davis concerning his deposition testimony, and Davis admitted that his deposition testimony made no reference to the placement of the bevel edge. Plaintiffs' claim that they were prejudiced by the court's rejection of their attempted impeachment of Davis lacks merit.

■ Related to this claim is plaintiffs' assertion that the circuit court erred when it refused to give their tendered jury instruction that Davis could be found negligent for failing to rotate the needle when a question of fact existed as to whether or not he had rotated the needle. A party has a right to have the jury instructed on his theory of the case as long as there is some evidence to support that theory. (*Erickson v. Muskin Corp.* (1989), 180 Ill. App. 3d 117, 535 N.E.2d 475.) In this case, however, Davis testified that he did, in fact, rotate the needle, and there was no testimony to the contrary. The fact that his deposition did not include such a statement was before the jury, but that impeachment by omission did not amount to evidence that he did not do so. Under these circumstances, the circuit court was well within its discretion in refusing the tendered instruction, since there was no evidence in the case to support the theory underlying the instruction.

In *Maple v. Gustafson* (1992), 151 Ill. 2d 445, 455, 603 N.E.2d 508, the Illinois Supreme Court stated that "[a] court's ruling on a motion for a new trial will not be reversed except in those instances where it is affirmatively shown that it clearly abused its discretion." In this case, plaintiffs have not clearly demonstrated an abuse of discretion on the part of the circuit court in refusing a jury instruction, in limiting impeachment, or in entering judgment on the verdict. Consequently, we affirm the circuit court's judgment in favor of Davis.

## II

■ Plaintiffs cross-appeal the circuit court's denial of sanctions in the form of attorney fees against Upjohn. Since plaintiffs fail to address this issue in their opening brief, however, the issue is waived, and this court need not consider it. 134 Ill. 2d R. 341.

## III

Upjohn argues that the evidence that Depo-Medrol's labeling format was mandated by the FDA was compliance evidence vitally important to its case and that its exclusion independently requires a new trial. Additionally, it argues that the evidence of post-1983 usage of Depo-Medrol was relevant to several critical issues in the case and that the exclusion of this evidence so seriously prejudiced it that it is entitled to a new trial.

## A

Upjohn argues that the jury could very well have reached a different verdict had the evidence regarding its request for a change in the Depo-Medrol labeling, and the FDA's response to that request, been admitted. In particular, since the punitive damages were assessed because of Upjohn's allegedly willful and wanton conduct in failing to warn, Upjohn argues that it is likely that it was prejudiced in this area by the exclusion.

Upjohn attempted to introduce this evidence at trial through Stubbs, the former medical monitor for Depo-Medrol, who was familiar with the labeling issue and the requested change. Upjohn made it clear that it offered the evidence as relevant to both the failure to warn claim and the punitive damages claim. Plaintiffs objected to the admission of the evidence, claiming that the global label change request had no relevance to the specific warning label for Depo-Medrol. Plaintiffs further argued that the evidence would be relevant only to a federal preemption claim and that Upjohn had not raised such a claim as an affirmative defense. The circuit court upheld plaintiffs' objection and excluded three exhibits and Stubbs' proposed testimony.

In Illinois, as Upjohn points out, evidence of compliance with federal requirements is not limited to preemption cases, but rather is admissible as relevant evidence in product defect cases. The Illinois Supreme Court has so held on two occasions. In *Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 396 N.E.2d 534, our supreme court addressed the admissibility of evidence tendered by the defendant to show the absence of a standard with respect to the particular design defect claimed by the plaintiff. The plaintiff had argued that a railroad tank car was defectively designed because it lacked a "head-shield," a protective device that would shield the car from damaging contact. Federal regulations did not require such a device at the time the tank car was manufactured. The Illinois Supreme Court allowed the defendant manufacturer to present this and other evidence of its compliance with federal standards on the grounds that it was rele-

vant to whether there was a design defect. *Rucker*, 77 Ill. 2d at 436-39, 396 N.E.2d at 534-36.

Similarly, citing its opinion in *Rucker*, our supreme court stated in *Moehle v. Chrysler Motors Corp.* (1982), 93 Ill. 2d 299, 443 N.E.2d 575, that "evidence of a product's compliance with governmental safety standards is relevant and admissible in a product liability case on the issue[ ] of *** whether a defect in the product is unreasonably dangerous." *Moehle*, 93 Ill. 2d at 304, 443 N.E.2d at 577.

The appellate court in *Hatfield v. Sandoz-Wander, Inc.* (1984), 124 Ill. App. 3d 780, 464 N.E.2d 1105, applied those holdings in a case similar to this one, where a pharmaceutical manufacturer allegedly failed to provide an adequate warning. *Hatfield* involved, among other things, compliance evidence regarding the FDA's inaction. The defense was allowed to argue to the jury that the FDA, after learning of the plaintiff's injuries, had failed to require a warning. (*Hatfield*, 124 Ill. App. 3d at 786-87, 464 N.E.2d at 1109.) Upjohn argues that in this case, as well, it sought to apprise the jury of its compliance with FDA requirements.

■ The question here turns on whether the FDA's response to Upjohn's request amounts to an FDA requirement not to warn with which Upjohn complied. Initially, Upjohn had been asked to submit proposed labeling changes as part of a global change in labeling for an entire class of its products, along with several other manufacturers. Exhibit 2N, the FDA's response to Upjohn's request for a labeling change, advised Upjohn that this specific warning related to a specific product and did not fit within the proposed global change relating to all products, and the request to include it as part of the global change was rejected. Upjohn was to "continue using currently approved labeling" until the company received "notification" from the FDA. However, within this same letter, the FDA pointed out to Upjohn that "[i]f important new labeling information becomes available, you should revise your approved product labeling under 21 CFR 314.8." Upjohn chose not to resubmit. While it is true that any changes to the Depo-Medrol labeling had to be approved by the FDA, and that the FDA disapproved of Upjohn's proposed change in this instance, it is not true as Upjohn implies that it was merely complying with FDA requirements in not changing its labeling to include a warning of the risk. The FDA did not *prohibit* Upjohn from changing its labeling; it merely required it to submit its change in the proper manner. Thus, *Rucker*, *Moehle*, and *Hatfield* are simply not on point. The circuit court properly excluded the evidence as irrelevant on the issue of the duty to warn.

■ On the issue of punitive damages, however, this evidence argu-

ably should not have been excluded. Upjohn reasonably could have maintained that, while it may have been mistaken regarding its rights and duties in light of the letter from the FDA, its actions based upon its interpretation of the letter fall far short of the willful and wanton conduct required for the imposition of punitive damages. The letter from the FDA was thus conceivably relevant to the issue of punitive damages, and arguably, Upjohn should have been allowed to place it before the jury. Because, however, we conclude that there was no duty to warn concerning a known risk under section IV, we need not resolve this issue.

## B

Upjohn also sought to introduce testimony that all the ophthalmologists who testified as experts in this case—Drs. Fagman, Giles, Deutsch, and Levine—still administer Depo-Medrol periocularly to their patients. When the circuit court excluded that evidence in a pretrial motion, according to Upjohn, it enabled plaintiffs to create a false impression that prejudiced Upjohn.

Plaintiffs argue that the circuit court's ruling here was consistent with its ruling that plaintiffs could not introduce evidence of post-1983 changes in the labeling of Depo-Medrol. The labeling change was excluded, however, because in Illinois subsequent remedial measures are inadmissible to show liability. (134 Ill. 2d Rules 342 through 351, 369; see *Schaffner v. Chicago & North Western Transportation Co.* (1989), 129 Ill. 2d 1, 14, 541 N.E.2d 643, 648.) The evidence of post-1983 usage of Depo-Medrol by the various expert ophthalmologists who testified at trial, on the other hand, arguably was relevant to the issues of causation (it tended to show that Davis would still have prescribed the drug even if Upjohn had provided warnings) and punitive damages (it tended to show that even if Upjohn could be held to have promoted periocular use of Depo-Medrol, such promotion could not be said to be the "deliberate[ ] inflict[ion of] a highly unreasonable risk of harm" required in Illinois by our supreme court in *Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404, 416, 563 N.E.2d 397, 402). Thus, Upjohn arguably is entitled to a reversal and a new trial because this evidence was excluded. Again, however, because we conclude that there was no duty to warn concerning a known risk under section IV, we need not resolve this issue.

## IV

In its appeal, Upjohn argues that because the specialized medical community was already aware of the risk that an inadvertent in-

traocular injection could cause blindness, plaintiffs failed to prove that a warning was required and, therefore, Upjohn is entitled to judgment notwithstanding the verdict. Plaintiffs respond that, under the standard of review for a motion for judgment notwithstanding the verdict required by *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, Upjohn has failed to show that all of the evidence so overwhelmingly favors it that no contrary verdict could stand as a matter of law. They point out that this is a much sterner standard of review than that for a motion for a new trial, which requires that the jury verdict be against the manifest weight of the evidence and that the circuit court abused its discretion in denying the motion. (*Maple v. Gustafson* (1992), 151 Ill. 2d 445, 603 N.E.2d 508.) Upjohn, in its post-trial motion and in its brief on appeal, argues for either judgment notwithstanding the verdict or, in the alternative, a new trial.

■ Under Illinois law there is no duty to warn of a risk that is already known by those to be warned. (*Kokoyachuk v. Aeroquip Corp.* (1988), 172 Ill. App. 3d 432, 526 N.E.2d 607, *appeal denied* (1988), 123 Ill. 2d 559, 535 N.E.2d 402.) A duty to warn exists only when there is "unequal knowledge and the defendant, possessed of such knowledge, knows or should know that harm might occur if no warning is given." (*Kokoyachuk*, 172 Ill. App. 3d at 439, 526 N.E.2d at 610.) In the context of prescription drug litigation, this principle means that a drug manufacturer need not provide a warning of risks known to the medical community. (See *Wooten v. Johnson & Johnson Products, Inc.* (N.D. Ill. 1986), 635 F. Supp. 799.) Further, pharmaceutical warnings for prescription drugs are given to physicians as "learned intermediaries." *Northern Trust Co. v. Upjohn Co.* (1991), 213 Ill. App. 3d 390, 572 N.E.2d 1030, *appeal denied* (1991), 141 Ill. 2d 545, 580 N.E.2d 119, *cert. denied* (1992), 502 U.S. 1095, 117 L. Ed. 2d 418, 112 S. Ct. 1172.

■ In this case, no duty to warn existed because the risks at issue were already known to the medical community. Initially, we note that Upjohn did not need to warn Davis about the general risk of performing the action which forms the basis of this litigation: the risk of accidentally penetrating the eye while performing a periocular injection. According to all of the ophthalmologists who testified at trial, this was a risk which was inherent with periocular injections and which was known by the entire ophthalmological community. As Davis testified, he always had the "little thought in the back of [his] head" that he might accidentally penetrate the eye. Clearly, Upjohn did not have a duty to warn the ophthalmological community of this obvious risk. *Kokoyachuk*, 172 Ill. App. 3d at 439, 526 N.E.2d at 610

("Where the danger is obvious and generally appreciated, nothing is gained by a warning and none is required").

■ Nor did Upjohn have the duty to warn of the specific risk at issue in this case, that is, the risk of an inadvertent intraocular injection causing blindness. The pertinent question for determining whether there is a duty to warn in this instance is whether the medical community was aware of this risk. There is ample evidence that the medical community was aware in 1983 of the risk of vision loss following accidental intraocular injection of the drug. Indeed, Davis himself testified that he knew of this risk.[1]

In addition, there were several reports in the medical literature describing incidents in which blindness resulted from an inadvertent intraocular injection of Depo-Medrol. For example, a 1981 article by Keith Zinn reported an instance of an intraocular injection of Depo-Medrol in which the patient's vision following the injection was measured at 20/400 (legally blind). (Zinn, *Iatrogenic Intraocular Injection of Depot Corticosteroid and its Surgical Removal Using the Pars Plana Approach,* 88 Ophthalmology 13 (1981).) A 1974 article by Schlaegel & Wilson reported six cases of accidental intraocular injections of corticosteroids, four of which involved Depo-Medrol. Of those four, two were followed by a complete loss of vision. Two of the other cases also suffered severe vision loss. (Schlaegel & Wilson, *Accidental Intraocular Injection of Depot Corticosteroids,* 78 Trans. Amer. Acad. Ophthalmology & Otolaryngology (1974).) A 1969 article by Moschini reported one inadvertent intraocular injection of Depo-Medrol that was followed by a complete loss of vision. (Moschini, *Accidental Introduction of Sustained-Action Corticosteroid in the Vitreous Humor,* 48 Boll. Oculist 426 (1969).) Several other articles and texts in the literature discussed the general dangers associated with the intraocular injection of steroids; still others reported incidents of intraocular injection of Depo-Medrol in which the adverse reactions were less than blindness or in which there were no long-term adverse reactions.

Physicians are held to a standard of medical expertise (see, *e.g., Kirk v. Michael Reese Hospital & Medical Center* (1987), 117 Ill. 2d 507, 517-18, 513 N.E.2d 387, 392-95) and may be expected to have

---

[1]"[Upjohn's attorney]: And you knew that on April 7, 1983 before the injection that if you put Depo-Medrol into the eye, itself, as a result of piercing with a needle, it could, could, [*sic*] lead to blindness?
[DR. DAVIS]: Yes."

knowledge of current medical literature. (See, *e.g.*, 40 Fed. Reg. 15394 (April 7, 1975).) Moreover, Davis testified that he had read articles in the medical literature describing the adverse effects of the intraocular injection of Depo-Medrol. These facts further support the conclusion that the specific risk at issue here was known to Davis, as well as to the medical community.

Plaintiffs maintain that, while Davis may have been aware that Depo-Medrol injected into the eye could be an irritant, and that it could cause blindness, he was unaware that Depo-Medrol could not be removed from the eye if injected into it. They argue that the difficultly of removing the drug from the eye created the only risk relevant to this case and that Upjohn had a duty to warn of this danger.

The relevant question here is whether Upjohn had greater knowledge than the medical community about any difficulty in removing Depo-Medrol from the eye. Dr. Stubbs, Upjohn's medical monitor for Depo-Medrol, testified that, based on information in the medical literature available in 1983, and in drug experience reports sent to Upjohn, he did not believe that Depo-Medrol would be particularly difficult to remove from the eye.[2] Likewise, in the course of testifying about instances reported in the literature in which Depo-Medrol had been injected into the eye, plaintiffs' expert, Dr. Walson, made a similar statement concerning the removability of the drug.[3] In addition, of the three drug experience reports received by Upjohn which described an intraocular injection of Depo-Medrol, two reported that a vitrectomy had been performed and that the Depo-Medrol had been removed. Thus, the record before us does not support the conclusion that Upjohn had greater knowledge than the medical community of any difficulty in removing the drug in the

---

[2]"[Plaintiffs' attorney]: Did you know the drug would be difficult to get out of the eye?

[DR. STUBBS]: I had no reason to think it would be particularly difficult, no.

Q. You had no reason?

A. Not from the characteristics of the drug. It's a suspension, watery suspension."

[3]"[Upjohn's attorney]: The Depo-Medrol as it was injected intraocularly dissolved?

[DR. WALSON]: Dissolved some of the—

Q. Without being taken out?

A. Sometimes it was removed, sometimes it was absorbed without any demonstrable toxicity."

event of an inadvertent intraocular injection. Hence, we cannot hold that Upjohn had a duty to warn of this potential danger.

Plaintiffs also point out that Davis testified he was unaware that Depo-Medrol was not approved for periocular injection and, further, that if he had been informed that Depo-Medrol was not recommended for periocular use in patients such as Meyer Proctor, he would not have used it. However, what Davis knew is not the issue. The relevant benchmark is not what a particular physician knows or does not know but, rather, what is known to the medical community.

■ A drug's approved uses or indications are set forth in its labeling; Depo-Medrol's labeling did not mention periocular administration. If the labeling does not list a particular use, then that use is *ipso facto* not approved. This is a fundamental fact of medical practice that any minimally trained physician should know. Davis' testimony that he did not know that Depo-Medrol was not approved for periocular use is irrelevant. Through every label and package insert included with the drug the medical community knew, and that is enough.

■ Plaintiffs also contend that Upjohn had a duty to warn of the risks associated with the periocular use of Depo-Medrol based, in part, on its having received 23 drug experience reports regarding eye-related reactions to periocular injections of Depo-Medrol. Of these 23 reports, three describe instances of blindness resulting from intraocular injections. Arguably, these three reports provided Upjohn with knowledge of the risk that an inadvertent intraocular injection of the drug could cause blindness. However, as discussed above, both Davis and the ophthalmological community at large were aware of this risk.

The remaining 20 drug experience reports discuss various adverse reactions to the periocular administration of Depo-Medrol. Thus, they are not relevant to the specific risk of intraocular injection which is before us here. Moreover, many of the side effects described in the drug experience reports, such as allergic or hypersensitivity reactions, tissue atrophy and sterile abscesses, were, in fact, listed on the 1983 package insert under the section detailing general, additional adverse reactions to parenteral corticosteroid therapy. Furthermore, the medical literature available in 1983 was replete with listings of the complications associated with periocular administration of corticosteroids. (See, *e.g.*, Giles, *Bulbar Perforation During Periocular Injection of Corticosteroids*, 77 Am. J. Ophthalmology 438, 438 (1974) ("Adverse effects, however, included elevated intraocular pressure, local irritation of tissue, infection at the site of injection, and perforation of the globe"); Schlaegel, *Nonspecific Treat-*

*ment of Uveitis,* 4 Clinical Ophthalmology ch. 43, at 4 (rev. ed. 1978) ("[w]ill probably develop some adrenal suppression[;] [d]iscomfort with injection[;] [r]ed irritable eye and ptosis[;] [o]ccasionally, white material is cosmetically objectionable[;] [s]ubconjunctival adhesions[;] [a]llergy to diluent[;] [m]ay get orbital infection[;] [r]are intraocular injection of steroid[;] [u]lceration of conjunctiva after repeated injections if not given behind the eye[;] [e]xophthalmos and rugae in fundus[;] [p]apilledema").) Therefore, even if we consider the 20 drug experience reports relevant to the specific risk at issue, we cannot conclude that they provided Upjohn with greater knowledge than the medical community of the general risks associated with the periocular use of Depo-Medrol.

Plaintiffs concede that if this case involved nothing more than the off-label use of a drug there would be no duty to warn. They maintain, however, that a duty must be imposed here because, by assisting ophthalmologists who engaged in clinical studies of Depo-Medrol in the early 1960s, Upjohn "planted the seed" that led to the widespread periocular use of the drug. We do not agree. However the periocular use of Depo-Medrol was initiated, the fact remains that from the time the drug came onto the market in 1959 until the injection in this case took place in 1983, the drug's labeling never listed periocular injection as an appropriate method of administration. Moreover, in the approximately 20 years between the time Upjohn assisted the ophthalmologists and the injection at issue here, the periocular use of corticosteroids had become widely practiced (Davis testified that he alone had made 1,600 injections in his career) and was frequently recommended. (See, *e.g.,* Nozik, *Periocular Injection of Steroids,* 76 Trans. Amer. Acad. Ophthalmology & Otolaryngology 695 (1972).) Whatever role Upjohn had in "planting the seed," by the time of Meyer Proctor's injection, the periocular use of Depo-Medrol was broadly accepted by a community of highly trained medical professionals who had made the decision to use the drug in an off-label manner. Because of this fact, we must conclude that the activities of Upjohn in the early 1960s did not create a duty to warn.

We note that our conclusion might have been different if, in fact, there had been a critical imbalance of information between Upjohn and the medical community; if, for example, Upjohn had vigorously and continuously promoted the off-label use while at the same time withholding crucial information about the drug to which only it had access. But, contrary to plaintiffs' assertions, that simply is not the case before us. Plaintiffs argue that Upjohn never reported to the medical community that "satisfactory" animal studies had not been done on the periocular administration of Depo-Medrol. However, that

information is implicit in the very fact that periocular use was an off-label use; a particular use can be recommended only if adequate studies have been submitted to and approved by the FDA. In short, the record demonstrates that the periocular administration of Depo-Medrol was an off-label use; that the ophthalmological community knew that inadvertent intraocular injections were a risk associated with periocular injections; and that it, and Davis in particular, knew that the intraocular injection of Depo-Medrol could result in blindness. To hold that Upjohn had a duty to warn, in light of these facts, would render the learned intermediary doctrine essentially meaningless. Under the circumstances, we see no reason for ignoring established precedent.

Relying on *Mahr v. G.D. Searle & Co.* (1979), 72 Ill. App. 3d 540, 390 N.E.2d 1214, *appeal denied* (1979), 79 Ill. 2d 612, the dissent maintains that a pharmaceutical manufacturer cannot evade its responsibility to warn of the risks of using its products by "hoping *** that the doctors will learn of the dangers themselves." (275 Ill. App. 3d at 616.) In *Mahr*, where the plaintiffs brought a cause of action for wrongful death, the deceased was alleged to have died as the result of an occlusion of the left internal carotid artery caused by the regular use of Enovid, an oral contraceptive. Searle, the manufacturer of Enovid, was held liable, in part, because of its failure to adequately warn of possible adverse effects associated with using the drug. The court noted that "Searle had the duty to adequately communicate the adverse effects of Enovid to all members of the medical profession who came into contact with [the deceased] in a decision-making capacity during the time she was using the drug." *Mahr*, 72 Ill. App. 3d at 562, 390 N.E.2d at 1230.

*Mahr* is simply not on point because, unlike the off-label use of Depo-Medrol at issue here, the Enovid in *Mahr* was used by the decedent in an on-label manner, that is, as an oral contraceptive. Thus, the duty described in *Mahr* was the duty to warn physicians of the adverse effects associated with the on-label use of a drug.

Here, however, the labeling for Depo-Medrol did not list periocular administration as an approved use. We do not have to "hope" that physicians will understand the general principle that there are risks attendant with the nonapproved use of a drug; this too is a fundamental fact of medical practice that any minimally trained physician should know. Nor, in this instance, do we have to hope that ophthalmologists will know the self-evident fact that there is a risk of penetrating the eye while performing periocular injections. Nor do we have to hope that ophthalmologists will know that inadvertent intraocular injections can cause blindness when that fact is known to the medical community, including, in this case, Davis himself.

The dissent also maintains that "Dr. Davis should not have used [the Depo-Medrol] as he did." (275 Ill. App. 3d at 615.) This is not debatable, at least in the sense that he should not have performed an intraocular injection. What is debatable—more properly, what must be rejected—is the dissent's implication that Davis and other ophthalmologists should not have been using Depo-Medrol at all. The record is clear that before the accidental intraocular injection, Meyer Proctor had benefited from the Depo-Medrol treatment. In addition, none of the four ophthalmologists who testified at trial suggested that anything known at the time, or subsequently discovered, would have made this treatment inappropriate. Moreover, as discussed above, Upjohn was prepared to offer evidence that at the time of trial, the four experts who testified still administered Depo-Medrol periocularly to their patients. Except for the negative effect of an accidental intraocular penetration, the record in this case, which demonstrates the beneficial use of Depo-Medrol, provides no basis for concluding that it should not have been used.

▮ The jury determined that there was a duty to warn in this case, and the circuit court found that determination was not against the manifest weight of the evidence. However, the jury's determination was based upon a misapprehension of the law and a misunderstanding of the learned intermediary doctrine. A proper understanding of that doctrine demonstrates conclusively that the jury's verdict was against the manifest weight of the evidence, and the circuit court therefore abused its discretion in denying the motion for a new trial. Further, because as a matter of law Upjohn had no duty to warn in this case, all of the evidence so overwhelmingly favors it that no contrary verdict can stand as a matter of law. Under the standard of review for a motion for judgment notwithstanding the verdict required by *Pedrick*, Upjohn is entitled to such judgment. We therefore reverse the judgment of the circuit court and enter judgment notwithstanding the verdict for defendant Upjohn.

Because we reverse on this ground, it is not necessary for us to reach Upjohn's other contentions regarding the duty to warn, warning causation, evidentiary rulings, jury instructions, or the excessiveness of compensatory or punitive damages.

Affirmed in part and reversed in part.

McCORMICK,[4] J., concurs.

---

[4]Justice McCormick participated in the decision in these appeals prior to

JUSTICE HARTMAN, concurring in part and dissenting in part:

I concur, not in the discussions, but in the dispositions, only, reached by the majority under Parts I, II, and III of the preceding opinion; however, I respectfully dissent from Part IV of the majority opinion for the reasons which follow.

The majority suggests that millions of periocular injections of corticosteroids such as Depo-Medrol were successfully made prior to the Proctor occurrence in November 1983. The basis for such an astronomical figure seems to be in opening remarks for defendant doctor, Dr. Michael J. Davis, made by his counsel, who told the jury that his client used an injection technique in connection with cataract patients and other patients in whom Dr. Davis had injected "everything from Depo-Medrol to anesthetic agents to antibiotics" 3,500 times in the eyes of his patients during the preceding 18 years. Counsel argued further that "there are some one million of 'these' injections that are given in the United States each year." There was no breakdown as to how many of "these millions" of intraocular injections involved Depo-Medrol, how many involved soluble corticosteroids rather than Depo-Medrol, how many involved anesthetic agents and how many involved antibiotics. The record shows that Dr. Davis was merely estimating what would be a "fair and reasonable" *guess* of how many times the *technique* of intraocular injections was used in general, but that Depo-Medrol was used by him on an average of about 89 times per year. Therefore, the opening statement by Dr. Davis' lawyer referred to the number of times the intraocular injection *technique* was used, not how many of these injections were made with Depo-Medrol.

It is important to make the foregoing distinction because Depo-Medrol is neither an anesthetic agent nor antibiotic, nor is it soluble, but it is a substance made to be released in the body over a period of six to eight weeks in human tissue with a lot of blood supply; however, the human eye does not possess such a blood supply. Depositing Depo-Medrol, which the record showed is an insoluble, toxic material, into the eye meant that the drug would remain in the eye for a relatively long time. Because of its insolubility, its crystals had an effect on the body's response to it when inserted, including increased intraocular pressure and other trauma. It became a foreign

his retirement from the Appellate Court of Illinois, First District, on August 1, 1995.

body in the eye, which was very difficult, if not impossible, to remove once injected into the eye. Upjohn, as its manufacturer, knew or should have known this, more so than anyone else, and must be held to the standard of an expert in the field. (*McEwen v. Ortho Pharmaceutical Corp.* (1974), 270 Or. 375, 528 P.2d 522.) Accordingly, Upjohn had a "*continuous duty* \*\*\* to warn physicians of the dangers incident to prescribing the drug, to keep abreast of scientific developments touching upon the manufacturer's product and to notify the medical profession of any additional side effects discovered from its use." (Emphasis added.) *Schenebeck v. Sterling Drug, Inc.* (8th Cir. 1970), 423 F.2d 919, 922.

The evidence showed that Upjohn had available to it pharmacologists, toxicologists, experimental laboratories, experts in animal studies, and laboratory animals. If Upjohn did not know what it should have known, it failed in its duty as an expert. It did not fulfill its duty as an expert merely by waiting for what it considered sufficient proof of a cause-effect relationship before advising the medical profession with an appropriate alert or warning of the possibility of risk in the use of one of its products. (See *Mahr v. G.D. Searle & Co.* (1979), 72 Ill. App. 3d 540, 564, 390 N.E.2d 1214, *appeal denied* (1979), 79 Ill. 2d 612 (*Mahr*).) Nor can failure to do so be excused merely by the fact that the potentially endangered users are few in number. (*Mahr*, 72 Ill. App. 3d at 560; *Crocker v. Winthrop Laboratories, Division of Sterling Drug, Inc.* (Tex. 1974), 514 S.W.2d 429, 432.) Contrary to the majority's suggestion that the inadvertent injection of Depo-Medrol into plaintiff's eye somehow relieves Upjohn of its responsibility, the injury here clearly was within the scope of the dangerous propensities of the drug for which Upjohn must be held accountable. *McMahon v. Eli Lilly & Co.* (7th Cir. 1985), 774 F.2d 830, 835.

The record showed the jury that Upjohn knew of these dangerous propensities before the instant occurrence took place in 1983. The jury heard evidence that there was no reference in the 1983 label or insert that subconjunctival use of Depo-Medrol as practiced upon plaintiff in this case was not recommended by Upjohn, nor was there ever Federal Food and Drug Administration (FDA) approval for such application. There was no mention on the label that 1 cc of the drug for use about and around the eye was an excessive dosage, according to one of its own expert employees. (See 275 Ill. App. 3d at 608 n.3.) Tissue atrophy developed in some patients after injection, which could be considered as evidence of a toxic effect, also known by Upjohn before 1983. (See 275 Ill. App. 3d at 608 n.3.) The 1983 package

insert made no reference to the fact, known by its employee, that the drug should be administered intramuscularly as "probably the predominant steroid effect is going to be a systemic effect anyway." (See 275 Ill. App. 3d at 608 n.3.) Nor did it point out that this preparation was a suspension and not a solution, and that the crystalline material in the area of sensitive subconjunctival tissue could be the cause in itself for injury. (See 275 Ill. App. 3d at 608 n.3.) Dr. Philip D. Walson, plaintiff's expert, was of the opinion that, given Upjohn's knowledge of the foregoing facts in 1962, the drug company should have warned that periocular use of the drug was not recommended and, under the adverse reaction section of the warning, should have listed the toxicity of the drug. The jury heard this evidence.

The record revealed that the FDA had approved the use of Depo-Medrol only for certain other uses, including three specific means of administration: intramuscularly, intra-articularly and intralesionally; none of those approved uses included the periocular use to which the drug was put in this case. Federal law required Upjohn to include package inserts and labeling recommendations which referred only to the three approved forms of administration for its product. Dr. Davis should not have used it as he did and Upjohn should have warned him and others of its potentially harmful effects which Upjohn knew about soon after it went on the market.

The majority finds no duty to warn in this case because, it argues, the "medical community" was aware in 1983 of the risk of vision loss and physicians were "learned intermediaries" who required no such warnings since they already knew of the dangers. (See *Mahr*, 72 Ill. App. 3d 540, 390 N.E.2d 1214.) The record supports a contrary conclusion, however, which the jury here reached. No physician or expert witness testified that the medical community knew what Upjohn knew with respect to dangerous toxicity and irremovability of this drug, once injected into the eye, as Upjohn knew of these characteristics, but shared with no one except its own employees.

The relevant history of the development of this drug, as shown by the record, reveals that by 1961, Upjohn had learned that some ophthalmologists were administering Depo-Medrol through periocular injection as an "off-label" use. The evidence shows that Upjohn fostered and encouraged this unapproved, off-label use as experimentation on human beings with no prior basic scientific studies made. This unauthorized use became more widespread in the next two decades, although Upjohn never secured FDA approval for it and

never set forth the use, warnings or directions for such periocular injections on its labels or in its literature. None of the dangers attendant to such use, or any reported deleterious side effects which may have developed of which Upjohn was apprised, were made known to the prescribing or treating physicians, the "learned intermediaries," who made this unauthorized use of it. Dr. Davis testified that he did not know of the drug's dangerous propensities, or he would not have used it. Dr. Thomas Deutsch, Upjohn's own expert, testified that, until he testified in this case, he did not know that Depo-Medrol would be difficult or impossible to remove once injected into the eye. What record evidence is there then to support the hypothesis that the "medical community knew" of these dangerous propensities? None is cited by the majority opinion; yet, it holds as a matter of law that "the medical community knew, and that is enough." (275 Ill. App. 3d at 609.) Such an unsupported conclusion flies in the face of established authority. *Tongate v. Wyeth Laboratories* (1991), 220 Ill. App. 3d 952, 963, 580 N.E.2d 1220 (*Tongate*).

A drug such as Depo-Medrol may be deemed unreasonably dangerous absent an adequate warning accompanying the product because the product may be "unavoidably unsafe" without such a warning. (*Kirk v. Michael Reese Hospital & Medical Center* (1987), 117 Ill. 2d 507, 517, 513 N.E.2d 387; *Lawson v. G.D. Searle & Co.* (1976), 64 Ill. 2d 543, 550-51, 356 N.E.2d 773.) A manufacturer of ethical drugs cannot evade its responsibilities in warning physicians of dangers and risks attendant to the use of its products, by hoping, as in the present case, that the doctors will learn of the dangers themselves. Upjohn's duty to warn was nondelegable; the failure of prescribing and treating physicians to learn of the risks of a drug from other sources does not relieve the manufacturer of liability for harm resulting from its own failure to adequately warn. (*Mahr*, 72 Ill. App. 3d at 566.) This was made clear in *Mahr*, 72 Ill. App. 3d at 561-62, in which the court stated:

"The nature of prescription drugs and the ethics involved in the professional practice of medicine are such that it is a physician who decides what medications, if any, a patient is to take. *Thus, while the manufacturer's duty to warn is for the benefit of the ultimate consumer of its products, the physician, in the role of a learned intermediary, is the person to whom the warnings are to be communicated.* (*Crocker v. Winthrop Laboratories; Ethicon, Inc. v. Parten; Stevens v. Parke, Davis & Co.; Carmichael v. Reitz* (1971), 17 Cal. App. 3d 958, 95 Cal. Rptr. 381.) Contrary to Searle's position, however, the adequacy of the communication of the warning

is not judged solely by reference to the information supplied by the manufacturer to the prescribing physicians. *** *Searle had the duty to adequately communicate the adverse effects of Enovid to all members of the medical profession who came into contact with Sandra Brewer in a decision-making capacity during the time she was using the drug.*" (Emphasis added.)

The majority inexplicably would distinguish *Mahr* on the ground that "the Enovid in *Mahr* was used by the decedent in an on-label manner" and, therefore, the manufacturer had "the duty to warn physicians of the adverse effects associated with the on-label use of a drug." (275 Ill. App. 3d at 611.) The majority then makes the astonishing assertion, citing no authority whatsoever, that any "minimally trained physician should know" that these are "risks attendant with the non-approved use of a drug." (275 Ill. App. 3d at 611.) One is not told who a "minimally trained" physician would be and, more importantly, why a "minimally trained" physician should know more about the risks of Upjohn's Depo-Medrol than, say, experts in the field of ophthalmology, two of whom testified in this case that they did not know of the toxicity or irremovability of the drug once injected into the eye, which is involved in this case. The jury heard this evidence.

More perplexing is the assertion by the majority that although "on-label" users should be warned of risks attendant to drug use, "off-label" users need not be, even though Upjohn knew of and encouraged this use. Worse, the majority would exonerate Upjohn from liability, as a matter of law, under the circumstances of this case, although Upjohn knew of the risks, yet did not share this knowledge with members of the profession acting in decision-making capacities in administering drugs to their patients, and encouraged misleading publicity and resultant unapproved use. Significantly, Upjohn knew how to warn, and did warn, doctors against certain uses of Depo-Medrol by advising these "learned intermediaries," for example, against intrathecal administration of this drug, which it printed on the insert distributed with the drug in 1983, before the instant insertion of Depo-Medrol into plaintiff's eye. Why warn "minimally trained" physicians against this use? The question answers itself. Upjohn, in another line or two of print on the insert, easily could have mentioned potential adverse reactions to the drug when injected intraocularly, of which it had learned over a period of preceding years from drug experience reports. (See 275 Ill. App. 3d at 608 n.3 & Appendix.) It did not advise these "learned intermediaries" of the potential adverse consequences of which by this time it had become aware, so that a physician could decide intelligently whether or not

to use or continue to use the drug on any given patient. When doctors are properly warned of the possibility of side effects and advised of the symptoms accompanying them, the chances that injury to the patient can be avoided are enhanced, particularly if it takes place slowly, as in the case with the injury in question here. *Sterling Drug, Inc. v. Cornish* (8th Cir. 1966), 370 F.2d 82, 85.

As previously mentioned, information regarding questionable reactions or side effects to this Upjohn product was contained in drug experience reports in Upjohn's possession, but not shared by it with the medical community. A physician, nurse, patient, pharmacist or someone in the hospital would contact the drug company and report the reaction or side effect. From June of 1963 through September of 1983, Upjohn received numerous adverse drug experience reports relating to repository Depo-Medrol therapy for intraocular disorders. Some of these are abstracted in the Appendix attached to this dissent. It should be noted, however, that in Dr. Walson's experience, the frequency of drug experience reports is less than the adverse effects which actually occur; in other words, not every adverse reaction was reported. He noted that the observations contained in drug experience reports to Upjohn, such as abscesses at the injection site, sloughing at the subconjunctiva, swelling at the injection site, residue being left in the area where the eye was injected, increased ocular pressure after the injection, blurred vision, anaphylaxis, and sudden blindness, could be evidence of the toxicity of the drug. He held the opinion that loss of vision, small white spots of residue, diminished vision and any kind of allergic response could also indicate toxicity of the drug. According to Dr. Walson, being on notice of that kind of information from the 1960's up to 1983, there were methodologies and scientific means available to Upjohn to confirm or disaffirm the toxicity of the drug. In his opinion, Upjohn should have included a warning on its label or package insert which said, in effect, do not use the drug in that way, and if so used, this is what may be seen.[5] This was never done. In light of this imbalance of access to information about adverse propensities of Depo-Medrol, it is

[5]Dr. Samuel Stubbs, one of Upjohn's Depo-Medrol overseers, testified that the book "Drug Induced Ocular Side Effects and Drug Inter-reactions" by Fraunfelder was in Upjohn's medical library in Kalamazoo. In the 1976 edition, it states "inadvertent intraocular steroid injections have caused blindness probably as a result of direct *drug toxicity* to the retina or optic nerve." (Emphasis added.) Dr. Stubbs admitted that it was part of his duties and responsibilities to be aware of this kind of information. Dr. Stubbs also knew that there had been several articles reporting the accidental injection of Depo-Medrol into the eye itself. Dr. Stubbs admitted that prior to the

difficult to fathom the basis for the majority's assertion that physicians had knowledge of the risks equal to Upjohn's.

The jury heard Upjohn's Dr. Samuel Stubbs testify. He was in charge of Depo-Medrol development. He did not know about the pharmacokinetic effects of Depo-Medrol when used in a local injection rather than systemic. He did not know that the drug would be difficult to remove from the eye. Dr. Stubbs never had anyone investigate by animal studies whether the drug would be toxic if it got into the eye. Prior to November 7, 1983, Dr. Stubbs never asked any Upjohn in-house personnel whether or not it would be difficult to remove the substance once it was injected into the eye.

A drug company cannot absolve itself from the duty to warn by pointing to the unauthorized use of its drug by physicians with whom it has not shared its knowledge of dangerous side effects and injury. Violation of its duty to warn is even more egregious in this case since, as the evidence heard by the jury demonstrated, Upjohn participated in disseminating misleading information concerning the use of its drug to the "learned intermediaries." Ironically, some of these very reports became part of the "literature" which was supposed to inform the "learned intermediaries" about application of the drug intraocularly. See, *e.g.*, text preceding footnotes 2, 5 and 7. Upjohn actually encouraged and promoted this off-label use of its product by certain physicians through financial support, technical assistance, and abundant supplies of the drug during the period when Upjohn was receiving adverse information concerning this use of the drug.

Persons at Upjohn who were most intimately familiar with Depo-Medrol and its potential harmful effects made the following observation, as Upjohn records in its brief:

> "In 1965, Dr. Samuel Stubbs, the Upjohn employee responsible for monitoring Depo-Medrol, collected articles in the medical literature and data supplied by these physicians, *and prepared a report for internal use* by the company. \*\*\* Based on that report, Dr. Stubbs and his immediate supervisor recommended that Upjohn consider filing a supplemental NDA to obtain FDA approval

---

incident, he knew that if Depo-Medrol got into the eye, its white substance might obscure a physician's ability to identify any damage from the injection. He was aware of articles which reported that the *substance remained in the eye*. None of this information was contained in Upjohn's labels or inserts.

Another writing concluded that Depo-Medrol remains active as long as it is visible. This text was dated 1978. Neither the package nor the label insert for Depo-Medrol stated, to November 7, 1983, how long the drug remained active around the eye.

for periocular administration of the drug, even though Dr. Stubbs thought it was likely to be administered in that manner to only 'a limited number of patients.' \*\*\* *Without FDA approval, Upjohn could not include that use of the drug as an approved route of administration on the Depo-Medrol labeling."* (Emphasis added.)

Dr. Stubbs, himself, questioned the reliability and the basic approach taken by some purportedly "independent studies" conducted by these certain physicians on their patients, as to both the safety and the efficacy of Depo-Medrol for periocular use. He knew that the so-called "studies" were conducted in an admittedly sloppy, ineffective, and dangerous fashion upon human subjects. Yet, these were the same "studies" actively encouraged and supported by Upjohn, studies which were advertised to the medical community by disseminating 2,500 reprints of an article extolling this FDA-unapproved use. The reprints were provided to doctors and hospitals by Upjohn employees, knowing all the while that this was an experimental use without benefit of prior basic scientific tests to show whether the drug could be utilized this way without harming humans. The jury heard this evidence.

Upjohn provided, in many instances without charge, vials upon vials of Depo-Medrol to these experimenters; it did not caution these off-label users that no animal studies had yet been initiated to test the reaction of the drug upon living tissue before embarking upon human use. Instead, Dr. Porter Crawford, another Upjohn employee responsible for monitoring Depo-Medrol at one time, responded to one such request for vials of the drug for this off-label experimentation as follows:

"Thank you very much for your recent letter and for your interest in Depo-Medrol for subconjunctival injection in the treatment of uveitis. We do not have any reports concerning this use for the preparation and *we would very much like for you to evaluate it in this way."* (Emphasis added.)

The record shows that Dr. Crawford sent to other such users more vials of Depo-Medrol and asked the doctors to let him know when they needed additional supplies. Dr. Crawford noted that Upjohn would "be anxious to learn how it performs when used this way."

Upjohn also provided funds to these off-label experimenters. Dr. Crawford, through Upjohn, provided one such doctor with $3,000 and another with $2,400 to support such projects. One such doctor, by letter dated December 31, 1959, indicated that he would mention his results with Depo-Medrol at a speech he would shortly be giving. This doctor later noted in a letter to Upjohn that he had given two talks in Chicago in the fall of 1960, during which he described the ad-

vantages of the use of Depo-Medrol for subconjunctival injections; yet in the same letter, he went on to admit that the *experimental work \*\*\* fell flat since we are unable to find anything in the aqueous.* (Emphasis added.)[6]

An article on the use of Depo-Medrol was written by the corresponding experimenting doctor in 1961, who later informed Dr. Crawford, on August 31, 1961, of the completion of the article, noting, however, *that he was unable to use any of his animal experiments because the results were "very unsatisfactory."* (Emphasis added.)

Upjohn nevertheless ordered and distributed 2,500 reprints of the article, 500 for "hospital sales" and 2,000 for "sales education," thus becoming part of the "literature" to which the ophthalmic community was exposed. On November 16, 1961, Upjohn also requested reprints of another experimenting doctor's article for distribution, which also mentioned the use of subconjunctival injections of Depo-Medrol.[7] More "fodder" priming the sales pump.

On March 8, 1963, Dr. Stubbs wrote to a different experimenting

---

[6]On March 8, 1961, Dr. Crawford wrote another letter to this same doctor about his use of subconjunctival injections of Depo-Medrol, stating:

*The F.D.A. has not approved this use for Depo-Medrol because we have had no clinical work to show to them.* (Emphasis added.)

[7]Meanwhile, on January 9, 1962, Bob Fuoto, one of Upjohn's salesmen in Manhattan, sent an inquiry to Upjohn's medical department, asking why the eye became "very red," and whether that condition could be prevented, following subconjunctival injections in cataract surgery patients. Dr. Gerard, from Upjohn, responded to this inquiry in a letter dated February 14, 1962:

"I know of no way of giving a definite answer \*\*\* as to why the eye becomes red after the subconjunctival use of Depo-Medrol. *I do think that it should be pointed out, however, that it has never been recommended that Depo-Medrol be used this way.* Our recommendations for Depo-Medrol is that the *injection be given deep intramuscularly* or if used for intralesional treatment of the skin, *that the injections be kept as small as possible. It seems to me that 1 cc. of Depo-Medrol subconjunctivally is a rather large dose to place in this area. When this amount is given subcutaneously in other areas of the body, it can occasionally cause tissue atrophy.* I would think that our best recommendation \*\*\* would be that at this dosage level of Depo-Medrol, \*\*\* the *medication [should be given] intramuscularly,* as probably the predominant steroid effect is going to be a systemic effect anyway. This preparation is a suspension and not a solution, and *it may well be that the crystalline material in the area of such a sensitive tissue as a subconjunctiva is the cause in itself for the redness.*" (Emphasis added.)

doctor, requesting case histories on the patients he had treated with Depo-Medrol, indicating that Upjohn needed the case reports to supplement its original new drug application. Dr. Stubbs informed him that Upjohn would compensate him for his time, and that of his secretary, in preparing the case reports. In response, by letter dated March 14, 1963, this doctor told Dr. Stubbs that he would begin working on the case reports and requested that Upjohn meanwhile send him more Depo-Medrol. On March 19, 1963, Upjohn sent him more vials of Depo-Medrol, without mentioning the information and precautions suggested by its Dr. Gerard to its salesmen in 1962. See 275 Ill. App. 3d at 608 n.3.

Harry P. Davis, Jr., another of Upjohn's sales representatives, wrote to Mr. Crissman, at the Upjohn Company in Cleveland, Ohio, on June 12, 1963, informing him that two Ohio physicians were using Depo-Medrol for "severe, chronic or acute, uveitis by retrobulbar injection," but that neither "learned intermediary" was aware that anything had been published on the use of this drug. Dr. Stubbs wrote to these two Ohio doctors on June 26, 1963, informing them that Upjohn was interested in their use of Depo-Medrol and requesting that they send Upjohn case reports of their experience with the drug. Dr. Stubbs further stated that if they were interested in publishing their work, he would make the "services of The Upjohn Writing Staff" available to them. In addition, Dr. Stubbs offered to pay for their secretary's time, and compensate the doctors for work on the case reports, thereby admittedly intending to "plant the seed" in those doctors' minds about publishing an article and making the Upjohn writing staff available for that purpose.

On July 1, 1963, the Ohio doctors responded with eight case reports. Dr. Stubbs turned this material over to Harold Tucker, one of Upjohn's medical writers, to determine whether it could be turned into a publication.[8] An article written as a result of Upjohn's expert

---

[8]Plaintiff's expert, Dr. Philip Walson, testified, however, that so few cases did not constitute sufficient experience with the drug. Further, the material received from these doctors did not provide complete data for purposes of making any scientific use according to accepted principles. No double blind studies were done, for example, making it difficult to evaluate whether the patient had improved spontaneously or because of the therapy or treatment received, although that scientific methodology was available to do these kinds of studies.

assistance proclaimed that positive results from the subconjunctival injection of Depo-Medrol had been confirmed by others! [9]

Upjohn's own expert, Dr. Stubbs, questioned the validity of the so-called studies. On September 19, 1963, he wrote to Jack Toole, Upjohn's hospital representative, regarding the data, stating:

> "I'm enclosing a copy of the letter I have written to him, and it is a mild rebuff for *the lousy data he sent us.* This sort of thing may have gone through before the new F.D.A. regulations, *but it certainly doesn't go now,* and at the risk of not getting any more data at all I feel it's time to start setting down *on some of these rather loose individuales* [sic]. I think [this doctor] is a good friend of ours and I don't have to [sic] many qualms that he is going to be upset, *but really the stuff that he let you send to me is almost worthless* for reasons as I mentioned in the letter to him." (Emphasis added.)[10]

Dr. Stubbs nevertheless indicated that he was forwarding more vials of Depo-Medrol to this doctor, followed by another supply of Depo-Medrol, on January 21, 1964.

The practice of publicizing unapproved uses of drugs, when sponsored by the pharmaceutical company, is not approved by the FDA as proper advertising; it resulted in continuing, unapproved, potentially dangerous use. Dr. Stubbs was aware that those experi-

---

[9]Dr. Walson also testified that those papers could not be used to justify the statement, because they were merely anecdotal, not scientific studies, and there was no proof for the claim that the procedure they employed was "simple and effective in those inflammatory ocular processes for which steroids are indicated."

[10]Dr. Stubbs knew what was needed, but what he did not get, from these reports, writing on September 19, 1963:

> "I would be most happy *to pay your secretary* a little bit extra for these case reports if she would be willing to re-work them, perhaps with an occasional word from you to cover the following points: *patient's identification; age; sex; diagnosis; duration of illness; therapy used,* and in this instance Depo-Medrol; the strength of the Depo-Medrol, in other words *how many milligrams per cc; the amount given; the frequency of injection, with dates as you have done to a certain extent; the results of therapy; and finally any side effects. This information is what the F.D.A. requires as a minimum and is certainly not my idea, although I think that their requirements are a minimal particularly for a type of therapy which is not completely accepted in a general way as yet."* (Emphasis added.)

menting physicians would subsequently write publications which appeared in medical journals,[11] for which Upjohn paid secretarial and editorial expenses. These writings, of course, would be addressed to the medical community and become available to ophthalmologists, thereby becoming part of the "current medical literature" so incredibly touted by the majority as part of the "standard of medical expertise" as a matter of law.

Upjohn stipulated that prior to November 7, 1983, it "had the capacity to perform in-house or refer out-of-house [experiments] to be done by private consultants research in the form of animal studies and all four phases of human studies." Upjohn had in its employ, or available to it, physicians, toxicologists, pharmacologists, statisticians and epidemiologists. Dr. Stubbs admitted that the animal tissue tolerance studies could have been performed if the company had wanted to do them. Such studies were already ongoing with other applications of the drug. Upjohn had the money, the personnel, the animals and the staffing to do that kind of testing if someone at Upjohn decided it should be done. If Upjohn had begun the animal tissue tolerance studies on the periocular use of Depo-Medrol in 1969 or 1970, it would have had the results well in advance of the casualty involved in this and, perhaps, other cases.

The majority concludes that the medical community knew that Depo-Medrol was not recommended for periocular administration because it was not listed on Upjohn's labeling and knew of the risk of vision loss following accidental intraocular injection of the drug. The majority's decision defies precedent and, as demonstrated by the pre-

---

[11]One such article, published in 1964, stated:

"Maximum local response may be expected with only minimal or no systemic steroid effects. '*A voluminous mass of reports* testifies to the efficacy and safety of this report in general medicine and in surgery.'"

The article went on to state:

"Similarly, an ophthalmologist has recently reviewed indications for *and the fine results to be expected from some subconjunctivally injected steroids.* This experience has been confirmed by others." (Emphasis added.)

Dr. Stubbs admitted that this article did not mention the need to conduct double-blind studies to assess the effectiveness of subconjunctival injections with Depo-Medrol; that the article, which had been written by Upjohn staff writers and submitted by Upjohn for publication, was already stating to the ophthalmic community that the use of this drug for subconjunctival injections was "safe, simple and effective," without performing double-blind or animal studies by Upjohn for the subconjunctival use of Depo-Medrol.

ceding analysis, ignores the facts of this particular case. The unanswered question persists: who in the medical community knew about the adverse effects of Depo-Medrol, which the majority holds as a matter of law? Certainly neither Dr. Davis nor the number of doctors whom Upjohn sponsored in the human experimental off-label use of its drug were aware of its dangers. Plaintiffs' expert testified that ophthalmalogists were not aware of the true facts but believed that periocular use of Depo-Medrol was safe and efficacious. *Significantly, in fact, Upjohn's own expert, Dr. Thomas Deutsch, an ophthalmologist who might qualify as a "minimally trained" expert, testified he himself did not learn that periocular injections of Depo-Medrol were difficult or impossible to withdraw and were an unlabeled use until after he became an expert in this case.* Doctors who have not been sufficiently warned of the harmful effects of a drug cannot be considered "learned intermediaries" and the adequacy of warnings is a question of fact, not law, for the jury to determine, as it did in the instant case. (*Tongate*, 220 Ill. App. 3d at 963; *Batteast v. Wyeth Laboratories, Inc.* (1988), 172 Ill. App. 3d 114, 127, 526 N.E.3d 428.) The majority's decision to the contrary here is, tragically, wrong.

What did the medical community know? The evidence conclusively demonstrates that Upjohn promoted, encouraged and advertised the off-label use of this drug by providing financial and technical assistance to a limited number of members of the medical community without attempting to communicate to these physicians and medical community at large the dangers and risks attendant to this use. The majority bases its decision, in part, upon the expectation that physicians will keep abreast of current medical literature. As has been shown, part of the literature, which Upjohn helped to generate, "planting the seed" in doctors' minds about contributing to the literature, and thereby helping to mislead the specialized ophthalmic community as to the potential harmful effects attendant to the intraocular injection of a drug which could be impossible to remove. Worse, the majority view, that the existence of literature in such a case constitutes knowledge on the part of doctors and the medical community equal to that of a drug's manufacturer, would encourage more writings of the type found in this case, fostered by the very defendant upon whom responsibility should be fixed. Such an insidious situation as here existed should be neither countenanced, encouraged nor condoned.

Upon this record, the jury had the right to conclude that Upjohn violated its duty to *adequately* warn and that it be held accountable under these circumstances. The jury did just that. To interfere with this verdict, except perhaps for a remittitur, is unauthorized by law and unwarranted by the facts.

For these reasons, I dissent.

## APPENDIX

Plaintiff's exhibit 120 was a list prepared by Dr. Samuel Stubbs from 1965 until 1983 containing drug experience reports with various patients of which Upjohn had notice, abstracted in part as follows:

June 18, 1963—five abscesses developed in three patients given subconjunctival injections of Depo-Medrol; abscesses resulted from increased particle size in the suspension.

June 20, 1963—patient developed a sterile abscess around the Depo-Medrol which was lying subconjunctivally; abscess ruptured; Depo-Medrol removed and the abscess evacuated; no side effects after removal.

October 21, 1964—patient's sloughing of conjunctiva at the site of subconjunctival injection, with a gradual decrease in reaction; not completely restored through surgery which necessitated cutting through involved tissues.

February 18, 1965—three patients exhibited pain, upper lid swelling, sheets of subconjunctival hematoma, and marked chemosis. The symptoms cleared slowly.

March 20, 1967—more than five different patients with "swelling, redness and fluctuation."

May 1968—patient developed gray white residue which remained subconjunctivally six to eight weeks after injection.

September 26, 1968—whitish residue left behind after Depo-Medrol injected; persists for many weeks after steroid activity ceased, gradually disappeared; similar reports noted by many other people.

February 21, 1991—injection led to red, swollen eyelid and blurred vision.

May 1971—adverse reactions filed—report of subconjunctival injection site inflammation and report of increased intraocular pressure.

May 1972—deposit remaining at the injection site; report of a glaucoma-like picture in association with subconjunctival administration of Depo-Medrol.

July 1974—several patients exhibited white precipitate that remained in the injection site for a period of one or two months. White deposit caused sufficient concern that physician stopped using the drug.

September 25, 1974—injection of 1 cc Depo-Medrol resulted in an immediate loss of vision.

"2$^1$/$_2$ hours later had NLP in both eyes. Paralysis of upgaze. No

pupillary response. White material in arterioles of fundus. Mental confusion. 36 hr later vision began to return. Fundus showed scattered retinal edema. Vision now OD—CF at 10-12 degrees OS—CF at 18-20 degrees. Atrophy of temporal iris OD. Cloudy vitreous OD."

February 1976—increase in intraocular pressure; patient discharging Depo-Medrol "through three sites in necrotic conjunctiva in the lower fornix"; injection site incised—piece of soft off-white tissue was removed; acute inflammatory reaction to the drug. Following removal of this material, the corneal oedema cleared almost immediately and patient made a good recovery.

September 1977—accidental injection of Depo-Medrol into the eye of a patient when trying to inject subconjunctivally; patient lost vision.

December 1977—blindness in one eye following an injection of the drug into the turbinate area of the nose.

September 1978—small white spot developing following subconjunctival injections of Depo-Medrol; spot remained for a long time at the injection site in the mucosal.

November 1978—temporary blindness accompanied by severe pain, following the injection of Depo-Medrol into the nose.

November 1979—intense swelling around the eyes and nose; blockage of the ears following injection of Depo-Medrol subconjunctivally.

September 1980—diminished vision in one eye following an injection of Depo-Medrol in the turbinates after nasal surgery.

May 1983—conjunctival necrosis overlying the area of the injection 17 days after a conjunctival injection of Depo-Medrol.

July 1983—blindness and eye damage following an implant into the eye with subconjunctival injection of Depo-Medrol.

September 1983—inadvertent injection of Depo-Medrol into the vitreous of the eye instead of the retrobulbar space; vitrectomy performed and patient regained partial vision.